[No. 15487.   Department One.   January 27, 1920.]

## A. J. WALCOTT et al., Respondents, v. J. B. WOOD, Appellant.[1]

BILLS AND NOTES (138, 146)—ACTIONS—WEIGHT OF EVIDENCE—FRAUD—DURESS.   In an action to cancel a note, executed under threat of arrest for theft of defendant's money, the evidence is insufficient to sustain a counterclaim for the amount of the note, where upon the issue as to its appropriation, plaintiff positively declared her ignorance and there was nothing but a flimsy showing, consisting mostly of pure suspicion, to indicate that she had taken it.

Appeal from a judgment of the superior court for King county, Smith, J., entered March 19, 1919, upon findings in favor of the plaintiffs, in an action to cancel a promissory note, tried to the court.   Affirmed.

*Gay & Griffin,* for appellant.

*Chadwick, McMicken, Ramsey & Rupp* and *J. E. Peterson,* for respondents.

MITCHELL, J.—This is an appeal from a judgment canceling a promissory note for $350, executed and delivered by respondents to appellant, upon the ground of want of consideration and because of duress, and denying appellant relief upon his counterclaim, wherein he sought judgment in said sum of $350, alleged to have been stolen from him by respondent Phoebe A. Walcott.

The trial was without a jury.   There are six assignments of error, the first five of which, as counsel for appellant admit, may fairly be considered under one head, viz.: "Did Mrs. Walcott find and appropriate Wood's purse and contents, Saturday, January 25, 1919?"   The question presents the trial of facts, and although a careful consideration of the evidence and

[1]Reported in 187 Pac. 375.

the arguments of counsel lead clearly to the conclusion reached by the trial court, we consider it appropriate, because of the gravity of the accusation and of the making of it, to set out the essentials of the evidence and our opinion thereon.

In substance, the case presents the following facts: Respondents are husband and wife, and for about ten years have lived upon and cultivated a small farm of fifteen acres belonging to them at or near Winslow, Kitsap county, Washington. They were in comfortable circumstances. He was sixty years of age and she was sixty-four. They lived alone and, it appears, did very little visiting. Appellant was thirty-nine years old and for two and one-half years had been an itinerant salesman, selling and delivering teas, spices, coffees, etc., for the Grand Union Tea Company, with headquarters at Seattle. For two years he had stopped as a guest at respondents' home, one week out of every month, that is, from Monday to the following Friday or Saturday, spending the nights and taking breakfast and supper there, for which he paid. Just prior to his present employment, appellant had been engaged for twelve to fourteen years in the hotel business at San Francisco, Los Angeles, and Houston. In January, 1919, he took with him on his route one Phillips (the father of the manager of the tea company), who was to take the place of appellant while the latter took a vacation of one or two months. They stopped at the Walcott house for the week ending January 25, 1919. On leaving Saturday morning for their day's work in the vicinity, appellant claims he left his purse, containing $356 in money and checks, in the bedroom; that it was not found by or delivered to him upon his return that afternoon; and he accused Mrs. Walcott of stealing it. More specifically, appellant and Mr. Phillips slept in the same bed Friday

night, appellant in front. He says that, in undressing, his purse dropped out of his trousers pocket onto the floor, under or near a chair, and upon Mr. Phillips' speaking of it, he replied he knew it, that it was as safe there as anywhere; that, on dressing and leaving the room the next morning before his companion did, he noticed the purse on the floor and forgot to pick it up. He did not go into the bedroom again until after he returned from his day's work. He says he had other money about his person.

Mr. Phillips said appellant had money, but that he did not know the amount; that, when they were preparing for bed Friday night, he noticed and spoke of appellant's purse falling to the floor, and that appellant replied it was safe there. He got the impression appellant was not going to leave the purse on the floor. He retired to the bed before appellant did. He did not know how much money the purse contained, or that it contained any. Upon arising and dressing the next morning, after appellant had left the room, he did not think of, nor did he see, the pocket-book. At the breakfast table there was some discussion, the details of which need not be given, reasonably resulting in Mrs. Walcott's not understanding they wanted supper that evening, but that they would leave by boat, at six o'clock, for Seattle. Appellant and Phillips traveled in an automobile. On making their first call on Saturday, about two miles from the Walcott house, appellant told Phillips he had left his purse on the floor in the bedroom. Upon being advised and urged to go back then and get it, he declined. In their work during the day, frequently they were not together. They returned to the Walcott house about five o'clock that afternoon, they say, while she says it was about four o'clock. Appellant rushed through the house into the dining room, and, addressing Mrs. Walcott,

who was sitting in a rocking chair reading, asked her if she had seen anything of his purse lying on the bedroom floor, and she answered: "No, Mr. Wood, I haven't been in your room all day." Appellant went into the bedroom alone and in a few minutes called to Mrs. Walcott that his purse was gone. Then she and the others made a search of the room without finding the purse. Leaving without supper, on the six-o'clock boat for Seattle, appellant told them he would be back on Monday and give them until then to see if they could not find it. He and Phillips went back on Monday, when appellant first said to Mr. Walcott that his wife had the money. The accusation hurt Mr. Walcott's feelings. Appellant then told both of the respondents that the only thing he could do was to get a search warrant and a warrant for her arrest, unless they wanted to settle. She positively denied the theft.

Appellant then went to Port Orchard, swore out an arrest warrant and a search warrant, and on Tuesday, with a deputy sheriff, appellant and Phillips went back to the Walcott home. On the way appellant told the officer if he could get the money not to arrest Mrs. Walcott. Leaving them near the house, the officer went in, told respondents who he was, the purpose of his call, and that he would have to search the house and the person of Mrs. Walcott. She objected to the search of her person by the officer, and then the officer said he would have a neighbor lady search her. He also told her he would have to take her to Port Orchard before the justice of the peace, who would fix the amount of bail bond. He said she was excited, and after talking awhile about the course of such cases, the officer told her he could not tell how much it would cost them; that he had known people to spend two or three thousand dollars on a dog. Finally Mrs. Walcott asked if there wasn't some way to settle the matter, and said

she would like to see Mr. Wood. The officer then told her he could get him, and went out and called in Wood and Phillips. Upon inquiry, appellant told them the matter could be settled for $350 in money. They advised him they had no money. Further conversation resulted in the execution and delivery of the note in suit, due in one year from its date. There was some talk also about later giving a mortgage, but that was not done.

Appellant claimed the money lost was his own, and admitted that at that time he owed his employer the sum of $450. It may be stated here that all the testimony shows Mrs. Walcott was feeble and for some months had suffered from the "flu," and probably a relapse of it, having been unable, during her severe illness, to procure proper care. She and her husband were alarmed for her health by the threat to take her to jail at that time of the year, and so stated to the officer and appellant in proposing to settle the matter. The officer frankly stated that, on the day he called to arrest her, in his opinion she was a seriously sick woman. He further testified that, when he first got to the door, she was greatly excited, so much so that, to use his own words, "I kinder felt as though I had the right party. I formed that opinion." But in cross-examination he frankly testified:

"No, when I first came to the door and she was greatly excited I didn't know that Mr. Wood had threatened an arrest. Yes, that would have explained her manner; I can see why she would be in that condition and don't attach any importance to it."

Mrs. Walcott testified that, at all times when appellant was staying at her house, her general rule was not to make up his room and bed until after supper. It has been noticed that she did not understand the two men would take supper at her house that Satur-

day; for she had heard Mr. Phillips say he intended taking supper with his family, and appellant at that time said he did not care where he took his supper. There is no doubt those things were said at the breakfast table and easily account for her understanding of the matter. Appellant says it came over his mind his purse was gone as soon as he stepped on the porch that evening.

"The reason I had a feeling, when I stepped on the porch, that the purse was gone forever, was the way things were. It just came over my mind that the purse was gone. There was no dinner ready, which was supposed to be ready at five o'clock, and most generally when I had come she would come to the door unless she was busy. This time she sat in the chair. It was just her attitude and manner. . . . Yes, one of the reasons I suspected her was the bed wasn't made up."

He testified that when he was to stay at her house at night he usually got in from six to eight o'clock, and she said, except on Mondays, he usually got in from seven to eight o'clock. On this Saturday she says he got in at four, and he says at five o'clock.

Mr. Phillips testified:

"When we came to the door that night and saw that the table had not been arranged and it didn't look like a meal was coming up on time, and her not having made up the bed, the idea struck me as rather queer."

Again, after referring once more to dinner not being ready, he said:

"Another thing was leaving the bed untouched, and it seemed that she was making it evident she had not been in the room that day; that is the way it impressed me, that she wanted to make up evidence to make it show she had not been in the room."

Mrs. Walcott, notwithstanding her feeble condition, had on that Saturday done the ironing, cleaned her house, other than the bedroom, as usual, gotten two

meals, helped her husband put in some plumbing on the back porch, attended to her chickens and other small chores in and around the house, and taken a nap of about twenty minutes. She said she was tired at the time of their arrival. Because, upon being questioned on two or three occasions, she became somewhat mixed as to whether one or more of those things had occurred in the morning or afternoon, and as to the exact length of time taken, or because in some one recitation one or more of those things was not mentioned as constituting her day's work, appellant undertakes to distort such discrepancies into inculpatory acts; and yet, at the trial of this case, which occurred on the thirty-seventh day after the note in suit was given, appellant, ripe in experience and keen from constant active contact with the traveling and trading public for fifteen years, could not remember, or at least testified he could not name, a single person, other than one, from whom he had within a few days prior to and on the 25th day of January, taken about $75 worth of small checks in selling his goods. He had testified there was about that much in small checks in his purse, and that he had made no effort to get duplicates, to have payment stopped on any of them, or even to ascertain who the persons were that had given the checks.

Mrs. Walcott, needless to say, positively declared her innocence of the theft, and with her husband testified that their only purpose in signing the note was to save her from the threat of enforcement of the criminal arrest warrant. They were required to pay five dollars to the deputy sheriff, who promptly reported the same to the justice of the peace who issued the warrant. Often, during the last two years, appellant had left money with Mrs. Walcott for safe-keeping during the day as he went out to work.

It will not do, even by the rule of the burden of proof in the trial of civil actions, upon such a flimsy showing, consisting mostly of pure suspicion, to find this woman guilty of so great a wrong. The evidence preponderates the other way.

It is deemed appropriate, as expressive of our conclusions and views of this matter, in taking leave of this phase of the case, to notice an incident that took place while the deputy sheriff was writing the note involved in this suit. The others present at that time were respondents, appellant and Mr. Phillips. Mrs. Walcott testified:

"Q. Explain just how you came to take hold of Mr. Wood's hand and where you were? A. I was sitting right by Mr. Wood at the table, so near him, and when they were making out the note I said, 'Oh, Mr. Wood, why did you do this to me. I haven't your money.' Will you let me repeat it? Q. Yes, repeat all you want? A. I said, 'Oh, Mr. Wood, you must know I was sick all week.' He said, 'Yes.' I said, 'Why did you do this to me?' I said, 'Why did you do this to me. I always thought a great deal of you as a gentleman.' He didn't say nothing. Q. Did you touch his hand at that time? A. Yes, sir. I had my hand on his or inside his, I don't know which."

It is proper to mention there is no suggestion or intimation in this whole record to indicate that either Mr. Walcott or Mr. Phillips had anything to do with the loss or theft of appellant's purse, if it was lost or stolen.

The only other assignment of error was the denial of the motion for a new trial. An examination of the record fails to show any abuse of discretion on the part of the trial court in that respect.

Judgment affirmed.

HOLCOMB, C. J., PARKER, and MAIN, JJ., concur.